**AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA,**
Appellant,

v.

**Robert M. CARUTH and MJC Quarterhorses, Appellees.**

No. 05–88–01276–CV.

Court of Appeals of Texas, Dallas.

Feb. 2, 1990.

Phillip W. Gilbert, Charles H. Smith, Dallas, for appellant.

George Nicholas, Marc H. Richman, Dallas, for appellees.

Before WHITHAM, LAGARDE and KINKEADE, JJ.

## OPINION ON MOTION FOR REHEARING

LAGARDE, Justice.

We grant the motions for rehearing filed by appellant, American Bankers Insurance Company of Florida, and appellees, Robert M. Caruth and MJC Quarterhorses. We withdraw our original opinion and judgment dated August 31, 1989. The following is now our opinion.

American Bankers appeals a judgment rendered in favor of Caruth and MJC. This suit arises out of an equine mortality insurance policy issued by American Bankers on a horse owned by Caruth and MJC. American Bankers raises forty-one points of error on appeal. Because we conclude that the trial court committed reversible error by commenting on the weight of the evidence, we sustain American Bankers' points four, five, six, seven, and thirty-five. We overrule points of error eight, nine, ten, eleven, twelve, twenty, and forty-one. Accordingly, we reverse and remand this cause for new trial regarding unliquidated damages only.

In November 1984, Caruth contracted with MJC to purchase a quarterhorse, Classy Winner (the horse), for $150,000. However, before Caruth purchased the horse, he contacted American Bankers and requested an insurance policy (the policy) that would pay $150,000 on the life of the horse. The policy was essential to Caruth's contract with MJC. Before American Bankers agreed to insure the horse, it required that Caruth submit a copy of his contract, the horse's breeding and show record, and a veterinarian's certificate confirming the horse's good health. American Bankers charged Caruth a premium based on the rate of 3.75% of the stated value of the horse. Caruth did not receive a copy of

the policy until more than two months after he entered into the insurance contract. Upon receipt of the policy, Caruth was under the impression that the policy covered the horse for the agreed amount of $150,000.

The horse died of a covered peril on February 12, 1985, while the policy was in full force and effect. Caruth filed a proof of loss and made demand for payment of $150,000. The policy issued by American Bankers promised an additional, supplemental payment in the event American Bankers did not pay Caruth/MJC within five days after receipt of the proof of loss. In the year after the horse died, Caruth contacted American Bankers on numerous occasions to secure the $150,000 payment due under the policy.

On February 26, 1986, more than one year after the horse died, American Bankers sued Caruth, seeking a declaratory judgment to determine the actual value of the horse. American Bankers claimed that the policy was an "actual value" policy that Caruth had requested and purchased. Thereafter, Caruth counterclaimed against American Bankers alleging: (1) breach of common law duty of good faith and fair dealing; (2) violations of the Texas Insurance Code; (3) violations of the Texas Deceptive Trade Practices—Consumer Protection Act (the DTPA); and (4) breach of contract.

In November 1987, Caruth and MJC served American Bankers with their second set of interrogatories (the interrogatories) and second request for production of documents (the request for production). In December 1987, American Bankers failed to properly respond to or properly object to the interrogatories or to the request for production. On January 25, 1988, Caruth and MJC filed their first motion for sanctions because of American Bankers' failure to comply with the discovery requests.

The trial court did not sanction American Bankers but granted a continuance of the February trial setting to allow American Bankers time to comply with the discovery requests. At that time, the trial court reset the case for April 4, 1988.

In American Bankers' original response to the request for information and documents, American Bankers responded that the information requested was contained in excess of 30,000 boxes containing numerous files in a warehouse, and American Bankers alleged that the only way to access the information was to manually inspect each of the files in each of the more than 30,000 boxes in their warehouse in Florida. Later, when American Bankers' computer staff was deposed, it was discovered that American Bankers has a sophisticated data base and computer which contained and could produce a great deal more information than was requested by Caruth and MJC. However, American Bankers still refused to answer interrogatories and provide the information and documents requested by Caruth and MJC.

On March 16, 1988, Caruth and MJC filed their second motion for sanctions because of American Bankers' continued refusal to answer interrogatories and request for production, as well as American Bankers' failure to produce documents pursuant to a subpoena duces tecum. In its response to the second motion for sanctions, American Bankers admitted that the discovery could be generated by the computer in approximately forty hours. At the March 23, 1988 hearing on Caruth and MJC's second motion for sanctions, American Bankers admitted that it had not complied with the discovery requests and that it deserved to be sanctioned; however, American Bankers requested that the trial court not strike its pleadings. American Bankers' trial attorney advised the court that the information had been produced by American Bankers, and if it had not been produced, it could be produced within four days. The trial court did not strike the pleadings but did sanction American Bankers $4,500 for its admitted failure to respond to discovery requests, intentional withholding of requested items, and production of "worthless" documents which amounted to no production at all. In addition to the above findings in its amended order of sanctions, the trial court ordered that all discovery be fully produced as requested on or before

10:00 a.m. on March 29, 1988, at Caruth and MJC's attorney's office; otherwise, the trial court would strike American Bankers' pleadings with prejudice.

On the April 4, 1988 trial setting, the trial judge held a hearing to determine if American Bankers had complied with the amended order for sanctions. At that hearing, Caruth and MJC reurged their motion for sanctions due to American Bankers' failure to comply with the discovery requests and the order compelling discovery and requested that the court impose additional sanctions. American Bankers advised the court that if it was given another continuance of sixty days that it could comply. The trial court granted Caruth's request for further sanctions and not only struck American Bankers' pleadings but conclusively deemed each and every allegation in Caruth's pleadings to be true and prohibited American Bankers from contesting those allegations by putting on any testimony of a defense or mitigation of those claims.

After the hearing on sanctions, the trial court proceeded to trial on April 4, 1988, and because American Bankers had no pleadings on file, the trial court entered a default judgment on liability and liquidated damages. Thereafter, a default judgment was taken against American Bankers with regard to liability. As a result, American Bankers was prohibited from asserting any claim or defense or from putting on any evidence or witnesses. The trial court held a jury trial on unliquidated damages on June 6, 1988. In its fourth, fifth, sixth, seventh, and thirty-fifth points of error, American Bankers complains that the trial court erred in reading its findings to the jury since that constituted a comment on the weight of the evidence. American Bankers maintains that during voir dire, the trial court began a repeated course of improperly commenting on the weight of the evidence, thereby marshalling evidence unfavorable to American Bankers and over-emphasizing negative facts deemed true as a result of its earlier default order. Ameri-

can Bankers asserts that its trial counsel made repeated objections to the trial judge's comments but that its attorney was consistently overruled. American Bankers characterizes the extended statement made to the jury by the trial court regarding fact findings as repetitive and harsh. Because of these statements made by the trial court, attorneys for Caruth and for American Bankers each moved for a mistrial.[1] On appeal, American Bankers argues that it was effectively denied a "fair and impartial trial" under the due process clause of the United States Constitution. American Bankers asserts that the trial court thereafter transcribed the statements made during voir dire into "Findings of Fact" which were incorporated into the court's charge. American Bankers again objected to the submission of these fact findings to the jury because they were an inappropriate comment on the weight of the evidence. American Bankers' objection was overruled.

American Bankers maintains that the most prejudicial aspects of these findings of fact were that, coming from the bench: (1) the findings gave tremendous weight, of an evidentiary nature, to repeated statements, in different shadings, to the alleged wrongdoings of American Bankers; and (2) the findings of fact incorrectly found the horse's value and Caruth and MJC's actual damages, as a matter of law, when those were contested issues. Thus, American Bankers argues that the lengthy lecture to the panel during voir dire regarding American Bankers' wrongdoings and the repetitive, inflammatory, and fundamentally incorrect fact findings appended to the charge all constitute the sort of instruction condemned by the Texas Supreme Court as "lengthy, repetitive and couched in terms of the victory or defeat of one of the parties." *Mobil Chemical Company v. Bell,* 517 S.W.2d 245, 256 (Tex.1975); *see* Tex.R. Civ.P. 277. American Bankers argues that it is not permissible for the trial court to marshal the facts in an instruction. *Gulf*

---

1. During Caruth's motion for mistrial, its attorney stated, in part: "[T]he Court confused and misstated the facts concerning the case....

And so the Court knows real well that the jury is going to pay a lot more attention to what you say than what I say."

*Coast State Bank v. Emenhiser,* 562 S.W.2d 449, 453 (Tex.1978).

American Bankers also asserts that the fact findings included a number of patent errors, most notably as to the amount of damages. The trial court purported to find $150,000 actual damages as a result of American Bankers' various "misrepresentation, deceptive trade practices, acts, omissions and conduct." American Bankers maintains that this supposedly included American Bankers' alleged misrepresentation that Caruth's policy was for a stipulated value of $150,000, when it was really for "actual value." American Bankers further argues that since the trial court also found "actual value" to be $150,000, there would have been no damages under Caruth's misrepresentation, warranty, or DTPA allegations. American Bankers also contends that it properly requested a jury issue regarding the "actual value" of the horse but that the trial court refused to submit it. American Bankers states that, instead, the trial court directly instructed the jury as to the amount of actual damages, in spite of the unliquidated nature of those damages.

The trial court, in its charge, presented the following "Findings of Fact" to the jury:

The Court has found the following facts to be true regarding AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA's dealings with ROBERT M. CARUTH AND MJC QUARTERHORSES in its solicitation, sale and claims settlement practices of Livestock Mortality Policy # LM0113057, that insured the life of the quarter horse, CLASSY WINNER:

1. On or about November 13, 1984, CARUTH/MJC applied for and received a life insurance policy LM0113057 insuring the life of a quarter horse named CLASSY WINNER from November 13, 1984 to November 13, 1985.

2. On or about February 12, 1985, the quarter horse, CLASSY WINNER, died of natural causes authorizing payment of the life insurance policy in the amount of $150,000.00.

3. CARUTH/MJC complied with each and every term of the policy of insurance, as set forth in the insurance policy. Notwithstanding CARUTH/MJC's duly and timely demand for payment under the terms of the insurance contract, AMERICAN BANKERS INSURANCE has failed and refused and continues to fail and refuse to pay CARUTH/MJC anything for the loss of the insured horse.

4. As a result of AMERICAN BANKERS INSURANCE'S lack of good faith and failure to pay CARUTH/MJC according to the terms of the insurance policy, CARUTH/MJC have been required to hire the Law Offices of Marc H. Richman to secure payment which is justly owed to them.

5. AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA authorized or ratified the actions of its officers, agents, servants, employees, or representatives in the processing and handling of all matters in this case and such was done in the normal and routine course and scope of employment of officers, agents, servants, employees or representatives of AMERICAN BANKERS INSURANCE.

6. AMERICAN BANKERS INSURANCE was tendered a copy of the contract to purchase the horse before the policy was issued and the contract required full insurance on the horse as a term of the contract.

7. At the time of the purchase of the one year life insurance policy, AMERICAN BANKERS INSURANCE required CARUTH to take the horse to its vet and had full knowledge that CARUTH had purchased CLASSY WINNER from MJC for $150,000.00 and that CLASSY WINNER was in good health. All information concerning the horse's show record, sire, dam, and siblings was available to AMERICAN BANKERS INSURANCE before the policy was issued.

8. AMERICAN BANKERS INSURANCE represented to CARUTH/MJC that they would be charged the yearly premium of $5,625.00 to insure the life of CLASSY WINNER.

9. AMERICAN BANKERS INSURANCE represented to CARUTH/MJC that, should CLASSY WINNER die during the term of the policy, AMERICAN BANKERS INSURANCE would pay CARUTH/MJC $150,000.00. AMERICAN BANKERS INSURANCE actually knew that all the parties needed, wanted, and required the full $150,000.00 coverage.

10. CARUTH/MJC, in reliance on the forgoing representations, paid AMERICAN BANKERS INSURANCE the policy premium of $5,625.00.

11. CLASSY WINNER died on February 12, 1985.

12. AMERICAN BANKERS INSURANCE refused to pay $150,000.00 as they [sic] had represented and promised and CARUTH/MJC discovered these misrepresentations when they were served with Petition for Declaratory Judgment denying that AMERICAN BANKERS INSURANCE owed $150,000.00 to CARUTH/MJC.

13. CARUTH/MJC are consumers, pursuant to the provisions of D.T.P.A.

14. AMERICAN BANKERS INSURANCE mislead CARUTH/MJC into believing that the life of CLASSY WINNER was insured for $150,000.00 and that AMERICAN BANKERS INSURANCE would pay $150,000.00 in the event that CLASSY WINNER died.

15. AMERICAN BANKERS INSURANCE caused confusion or misunderstanding as to the source, sponsorship, approval or certification of the insurance policy on CLASSY WINNER, that was represented to insure the horse for $150,000.00.

16. AMERICAN BANKERS INSURANCE represented that insurance policy had sponsorship, approval, characteristics, ingredients, uses, benefits, and quantities which it did not have, in that the policy was represented to pay $150,000.00 if CLASSY WINNER died during the term of the policy.

17. AMERICAN BANKERS INSURANCE represented that the insurance policy was of [a] particular standard, quality, and grade when it was of another.

18. AMERICAN BANKERS INSURANCE represented that the life insurance agreement conferred or involved the right of CARUTH/MJC to receive and the obligation of AMERICAN BANKERS INSURANCE to pay $150,000.00 if CLASSY WINNER died during the term of the life insurance policy.

19. AMERICAN BANKERS INSURANCE charged CARUTH/MJC the premium based on the purchase value of CLASSY WINNER. AMERICAN BANKERS INSURANCE failed to disclose the fact that they [sic] would or might contest the value of CLASSY WINNER if the horse died during the term of the policy, in order to induce CARUTH/MJC to purchase the insurance policy and CARUTH/MJC would not have purchased the policy had they known that AMERICAN BANKERS INSURANCE would or might contest the value of CLASSY WINNER.

[ ] AMERICAN BANKERS INSURANCE issued a policy of insurance of $150,000.00 coverage and for a premium that would purchase $150,000.00 worth of coverage when it knew or should have known that they [sic] did not intend to pay $150,000.00 for any horse.

20. AMERICAN BANKERS INSURANCE have [sic] engaged in an unconscionable action and an unconscionable course of action by:

(a) Taking advantage of the lack of knowledge, ability, experience, and capacity of CARUTH/MJC to a grossly unfair degree in that AMERICAN BANKERS INSURANCE represented that the life insurance policy would pay $150,000.00 in the event that CLASSY WINNER died during the term of the policy when they [sic] intended to keep the full premium if CLASSY WINNER lived and estimate the value of the horse at $25,000.00 if CLASSY WINNER died;

(b) Charging CARUTH/MJC $5,625.00 a yearly premium based on the value of CLASSY WINNER being $150,000.00 to pay $150,000.00 and subsequently contesting that CLASSY WINNER was not

worth anything near $150,000.00. The foregoing results in gross disparity between the value received and the consideration paid in this transaction involving transfer of consideration.

21. CARUTH/MJC sought the services of AMERICAN BANKERS INSURANCE for the purpose of insuring the life of CLASSY WINNER that CARUTH had purchased from MJC, under terms of installment sale contract.

22. Agents for AMERICAN BANKERS INSURANCE held themselves out to be specialists in the business of insuring quarter horses and expressly represented that the CARUTH/MJC investment in CLASSY WINNER would be protected by the AMERICAN BANKERS INSURANCE policy and that the policy would pay $150,000.00 in the event that CLASSY WINNER died during the term of the policy. CARUTH/MJC relied on the express representations, advice and expertise of AMERICAN BANKERS INSURANCE agents in the purchase of the insurance policy that is the subject of this suit.

23. AMERICAN BANKERS INSURANCE breached their [sic] express warranties to CARUTH/MJC by refusing to pay $150,000.00 in benefits owed as a result of the death of CLASSY WINNER or even attempting to make any good faith offer of settlement after:

(1) Representing that they would pay $150,000.00 in the event that CLASSY WINNER died during the term of the policy; when they knew or should have known that they would not do so and as a standard matter of course do not do so on horses of higher value.

(2) Representing that the premiums that were charged to insure the life of CLASSY WINNER were based on the $150,000.00 that AMERICAN BANKERS INSURANCE would pay if CLASSY WINNER died or at least make a good faith offer of settlement.

24. AMERICAN BANKERS INSURANCE breached their implied warranty to CARUTH/MJC that the insurance policy would protect their $150,000.00 investment in CLASSY WINNER and CARUTH/MJC disclosed actual value paid for CLASSY WINNER and AMERICAN BANKERS INSURANCE agreed with this actual value and charged CARUTH/MJC a premium based on protecting this $150,000.00 actual value, and then refused to pay the policy benefits when CLASSY WINNER died or make any good faith offer of settlement.

25. AMERICAN BANKERS INSURANCE breached their [sic] implied warranty of fitness when CARUTH/MJC sought their [sic] expertise in insuring quarter horses in order to protect the $150,000.00 investment in CLASSY WINNER, and AMERICAN BANKERS INSURANCE sold them a policy that was represented to protect the investment in CLASSY WINNER, but which failed to do so.

26. AMERICAN BANKERS INSURANCE mislead CARUTH/MJC and engaged in unfair insurance practices by failing to disclose that they would contest the value that they [sic] agreed was the actual value of CLASSY WINNER, at the time the insurance policy was consummated.

27. AMERICAN BANKERS INSURANCE misrepresented that they were basing the $5,625.00 policy premium on the amount they would pay in benefits if CLASSY WINNER died during the term of the policy.

[] AMERICAN BANKERS INSURANCE, as a standard course of conduct does not offer to pay the face amount of the policies for horses and livestock that they [sic] base[s] the premium on when rating the policy. When and if the animals so insured do die, then AMERICAN BANKERS INSURANCE routinely seeks and obtains estimates of the value of the dead animals that are so unreasonably low that they can be used to make offers of settlement that are unreasonable and unfair.

28. There exists a special relationship between CARUTH/MJC and AMERICAN BANKERS INSURANCE that arises in the insurance contract context

in which this suit is brought, and advice given by the defendant to the plaintiff[s].

29. There is no reasonable basis for denial of CARUTH/MJC'S claim for $150,000.00 or refusal to timely make a good faith offer to settle or delay in payment of $150,000.00 as a result of the death of CLASSY WINNER when AMERICAN BANKERS INSURANCE represented that they would pay $150,000.00 in the event that CLASSY WINNER died during the term of the policy and charged CARUTH/MJC a premium based on the actual value of CLASSY WINNER being $150,000.00.

30. There is no reasonable basis for denial of CARUTH/MJC'S claim for $150,000.00 or delay in payment of $150,000.00 as a result of the death of CLASSY WINNER on the basis that the actual value of CLASSY WINNER is "vastly lower" that [sic] $150,000.00 when three months prior to the death of CLASSY WINNER, AMERICAN BANKERS INSURANCE acquiesced and did not dispute that the actual value was $150,000.00, and were [sic] more than willing to accept and did accept a premium based on the value of CLASSY WINNER being $150,000.00.

31. AMERICAN BANKERS INSURANCE further breached their [sic] duty of good faith and fair dealing by failing to inform CARUTH/MJC that, as a condition precedent to receiving benefits under the policy, CARUTH/MJC would have to prove the actual value of CLASSY WINNER.

32. AMERICAN BANKERS INSURANCE further breached their [sic] duty of good faith and fair dealing leading CARUTH/MJC to believe that AMERICAN BANKERS INSURANCE was accepting $150,000.00 as the actual value of CLASSY WINNER while failing to disclose a method to determine actual value in the insurance contract.

33. AMERICAN BANKERS INSURANCE further breached their [sic] duty of good faith and fair dealing by refusing to pay that portion of actual value of CLASSY WINNER that was not disputed to CARUTH/MJC thereby depriving CARUTH/MJC of the use and benefit of said sum.

34. The failure to pay the claim within five (5) days further breached the prompt payment of claims endorsement of the above mentioned policy.

35. The acts and practices described in all counts and causes of action were committed knowingly by AMERICAN BANKERS INSURANCE.

## DAMAGES APPLICABLE TO ALL COUNTS AND CAUSES OF ACTION

36. As a direct result, proximate cause, and/or producing cause of the misrepresentations, deceptive trade practices, acts, omissions, and conduct of AMERICAN BANKERS INSURANCE, CARUTH/MJC have suffered actual damages in the amount of $150,000.00 plus interest allowed by the subject contract.

The trial court rendered judgment on the verdict. Caruth and MJC were awarded $414,000 under their DTPA cause of action, $5,000,000 in exemplary damages, and $80,800 for attorney's fees with additional provisions if the cause was appealed.

 An impermissible comment on the weight of the evidence occurs, when after examining the entire charge, it is determined that the judge assumed the truth of a material controverted fact, or exaggerates, minimizes, or withdraws some pertinent evidence from the jury's consideration. *Lively Exploration Co. v. Valero Transmission Co.*, 751 S.W.2d 649, 653 (Tex.App.—San Antonio 1988, writ denied). The comment must also be one that probably caused the rendition of an improper judgment. *Id., citing Alvarez v. Missouri–Kansas–Texas R.R. Co.*, 683 S.W.2d 375, 377 (Tex.1984) and *Hirdler v. Boyd*, 702 S.W.2d 727, 730 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.). However, incidental comments are permissible when necessary or proper as part of an explanatory instruction or definition. *Lively Exploration*, 751 S.W.2d at 653, *citing Board of Regents of N. Texas State Univ. v. Denton Constr. Co.*, 652 S.W.2d 588, 595 (Tex.App.

—Fort Worth 1983, writ ref'd n.r.e.) and *Hirdler*, 702 S.W.2d at 730.

■ We conclude that the trial court, in this instance, did comment on the weight of the evidence. While, as argued by Caruth and MJC, it is not error for the trial court, in charging the jury, to assume an uncontroverted fact, *see McDaniel v. Tucker*, 520 S.W.2d 543, 548 (Tex.Civ.App.—Corpus Christi 1975, no writ), the trial court, in this case, went beyond simply charging the jury as to uncontroverted facts. The trial judge made more than mere incidental comments. We hold that the findings of fact were unnecessary and impermissible comments on the weight of the evidence which were calculated to prejudice the rights of American Bankers in the eyes of the jury. The findings of fact were not designed to be helpful to the jury in answering any of the questions in the court's charge, and as evidenced by the trial court's failure to label them as "instructions," the findings of fact were not instructive to the jury in answering any of the questions in the charge. Consequently, we conclude that the trial court's comments tended to imply to the jury that the trial judge thought the law and the facts were in favor of Caruth and MJC and that they should be compensated commensurately. To warrant reversal, the comments must be ones that were reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *See* Tex.R.App.P. 81(b)(1). We conclude that the judgment itself reflects that the findings of fact were erroneously prejudicial.

■ Caruth and MJC contend that even if the trial court improperly commented on the weight of the evidence, American Bankers waived the error by failing to file "suitable affidavits" with its motion for new trial and by failing to request a hearing on the motion for new trial. We conclude that the appellees' argument is of no moment since a motion for new trial is not a prerequisite to an appeal regarding an improper comment on the weight of the evidence. *See* Tex.R.Civ.P. 324. Accordingly, American Bankers' fourth, fifth, sixth, seventh, and thirty-fifth points of error are sustained.

Because we hold that the trial court improperly commented on the weight of the evidence and, thus reversible error was committed, it is not necessary to the disposition of this appeal that we address all of the remaining points of error. Tex.R. App.P. 90(a). However, we do find it necessary to address American Bankers' eighth, ninth, tenth, eleventh, twelfth, twentieth, and forty-first points of error regarding discovery sanctions.

■ In the seven points enumerated above, American Bankers asserts that the trial court erred, abused its discretion, and violated the due process clause of the fourteenth amendment to the United States Constitution by imposing the sanctions of striking American Bankers' pleadings, refusing to grant American Bankers' motion to extend time to comply with the trial court's order and for continuance of the trial setting, and rendering a default judgment. In analyzing American Bankers' seven points of error, we keep in mind that the standard of review is whether the trial court abused its discretion. The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985). Rather, it is a question of whether the court acted without reference to any guiding rules and principles. *Id.* at 241–42. Another way of stating the test is whether the act was arbitrary or unreasonable. *Id.* The mere fact that a trial judge, within his discretionary authority, may decide a matter in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.*

■ In order to determine the trial court's guiding rules and principles in imposing sanctions for discovery abuse, we must look to rule 215 of the Texas Rules of Civil Procedure. As explained in *Downer*, the rules of civil procedure pertaining to discovery and sanctions for noncompliance have been amended several times and the

use of sanctions by trial courts to prevent discovery abuse has developed steadily over the past several years. *Downer,* 701 S.W.2d at 242. These changes reflect a continuing pattern not only to broaden the discovery process but also to encourage sanctions for failure to comply. *Id.* The Texas Supreme Court has stated that the purposes of discovery sanctions are to: (1) secure the parties' compliance with the rules of discovery; (2) deter other litigants from violating the discovery rules; and (3) punish parties that violate the rules of discovery. *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986). A trial court abuses its discretion if the sanction it imposes does not further one of the foregoing purposes. *See Downer,* 701 S.W.2d at 242.

■ In exercising its discretion in choosing the appropriate sanction, the trial court was not limited to considering only the specific violation committed but was entitled to consider other matters which had occurred during the litigation. *Medical Protective Co. v. Glanz, M.D.,* 721 S.W.2d 382, 388 (Tex.App.—Corpus Christi 1986, writ ref'd), *citing Downer,* 701 S.W.2d at 242. In this instance, Caruth and MJC served American Bankers with their second set of interrogatories and second request for production of documents, and American Bankers failed to properly respond or properly object. On January 25, 1988, Caruth and MJC filed their first motion for sanctions. At that time, the trial court did not sanction American Bankers but did grant a continuance of the February trial setting in order to allow American Bankers time to comply with the discovery requests. The trial court reset the cases for trial on April 4, 1988. Although American Bankers' original response stated that the requested information was contained in excess of 30,000 boxes, American Bankers' computer staff, when deposed, stated that American Bankers has a sophisticated data base and computer which contained and could produce a great deal more information than was requested by Caruth and MJC. However, American Bankers still failed to answer interrogatories and failed to produce the requested documents.

On March 16, 1988, Caruth and MJC filed their second motion for sanctions because of American Bankers' continued refusal to answer interrogatories, as well as American Bankers' failure to produce documents pursuant to the request of Caruth and MJC. American Bankers responded to the second motion for sanctions, admitting that discovery could be generated by the computer in approximately forty hours. At the hearing on the motion, American Bankers admitted that it had not complied with the discovery requests and that it deserved to be sanctioned. American Bankers requested that its pleadings not be struck and advised the trial court that the information had been produced or would be produced within four days. The trial court did sanction American Bankers $4,500 for its admitted failure to respond to the discovery requests, intentional withholding of requested items, and production of "worthless" documents which apparently amounted to no production at all. The trial court also ordered that all discovery be fully produced as requested on March 29, 1988.

On April 4, 1988, the trial court determined that American Bankers had not complied with its order that all discovery be fully produced on March 29. At that time, the trial court granted Caruth's request for further sanctions and not only struck American Bankers' pleadings but conclusively deemed each and every allegation in Caruth's pleadings to be true and prohibited American Bankers from contesting the deemed truth of those allegations by putting on any testimony of a defense or mitigation of those claims.

The record before us contains no indication that the trial court was capricious, arbitrary, or unreasonable. Therefore, we conclude that the trial court did not abuse its discretion with regard to the sanctions imposed upon American Bankers.

■ American Bankers also argues that its due process rights were violated. American Bankers explains that the information requested by Caruth and MJC covered "thousands and thousands of claims"; thus, American Bankers could not reason-

ably comply with the discovery request. However, based upon the record, American had numerous opportunities between November 1987 and April 1988 to either comply with the discovery request or properly object, which American Bankers failed to do. In view of the foregoing facts regarding American Bankers repeated refusal to supply the requested answers to interrogatories and to supply the requested documents for production and in light of the fact that ˙American Bankers' computer staff admitted that the requested information could be produced, we conclude that American Bankers was not denied its right to due process. American Bankers' eighth, ninth, tenth, eleventh, twelfth, twentieth, and forty-first points of error are overruled.

We recognize that rule 81(b)(1) of the Texas Rules of Appellate Procedure provides that "a separate trial on unliquidated damages alone shall not be ordered if liability issues are contested." In this case, however, because of the sanctions imposed, liability was established as a matter of law, thus uncontested. This Court has previously held that it can see "no distinction in the treatment of cases between those where the defendant failed to answer in a lawsuit and where the defendant's answer has been stricken from the record as a result of the imposition of sanctions." *Fiduciary Mortgage Co. v. City Nat'l Bank*, 762 S.W.2d 196, 200 (Tex.App.—Dallas 1988, writ denied). Inasmuch as we have previously held in this opinion that the trial court did not abuse its discretion in imposing sanctions and, thus, the action which resulted in uncontested liability was proper, this cause is reversed and remanded to the trial court for a new trial on unliquidated damages only. *See id.* at 205. *See also* Tex.R.App.P. 81(b)(1). We do not find it necessary to address American Bankers' remaining points of error. *See* Tex.R. App.P. 90(a).